# United States Court of Appeals for the Federal Circuit

2007-7008


STEVEN PREMINGER,

Petitioner,

v.

SECRETARY OF VETERANS AFFAIRS,

Respondent.


Scott J. Rafferty, of Washington, DC, argued for petitioner.

Jane W. Vanneman, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Jeffrey S. Bucholtz, Acting Assistant Attorney General, and Jeanne E. Davidson, Director.

Appealed from:   Department of Veterans Affairs

# United States Court of Appeals for the Federal Circuit

2007-7008

STEVEN PREMINGER,

Petitioner,

v.

SECRETARY OF VETERANS AFFAIRS,

Respondent.

On petition for review pursuant to 38 U.S.C. Section 502.

DECIDED: February 25, 2008

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

Petitioner Steven Preminger brings a constitutional challenge to the validity of 38 C.F.R. § 1.218(a)(14), a regulation promulgated by the Department of Veterans Affairs ("VA").[1] He does so pursuant to 38 U.S.C. § 502, which gives this court authority to review rulemaking by the VA.

---

[1] In the interest of convenience, we use the term "VA" to refer to both the Department of Veterans Affairs and its predecessor, the Veterans Administration.

Section 1.218(a)(14) governs the conduct of visitors on property under the charge and control of the VA. Among other things, it prohibits visitors to VA property from engaging in "demonstrations" unless authorized by the head of the facility involved. Id. § 1.218(a)(14)(i). The regulation defines "unauthorized demonstrations" to include "partisan activities, i.e., those involving commentary or actions in support of, or in opposition to, or attempting to influence, any current policy of the Government of the United States, or any private group, association, or enterprise." Id. § 1.218(a)(14)(ii). Mr. Preminger challenges section 1.218(a)(14) on two grounds. First, he argues that, in promulgating the regulation, the Secretary of the VA ("Secretary")[2] exceeded his statutory authority and failed to engage in required notice and comment rulemaking. Second, he argues that the regulation on its face violates the First Amendment to the United States Constitution. For the reasons set forth below, we reject Mr. Preminger's challenge to the promulgation of section 1.218(a)(14). In addition, we hold that section 1.218(a)(14) does not on its face violate the First Amendment. We therefore deny Mr. Preminger's petition to invalidate the regulation.

BACKGROUND

I.

Mr. Preminger is the chairman of the Santa Clara County, California, Democratic Central Committee ("SCCDCC"). He wishes to register to vote veterans who reside at the VA's Menlo Park, California, Medical Center ("Menlo Park Medical Center" or "Medical Center").

---

[2] In the interest of convenience, we use the term "Secretary" to refer to both the Secretary of the VA and the Administrator of the Veterans Administration.

2007-7008                                        2

In April of 2004, Mr. Preminger, his attorney Scott Rafferty, and another individual, visited Building 331 at the Menlo Park Medical Center, intending to register voters. However, when Mr. Preminger's party visited Building 331, a VA employee told the party to leave, which it did.

## II.

After being turned away from the Medical Center, Mr. Preminger, along with the SCCDCC, filed suit in the United States District Court for the Northern District of California, seeking an injunction against enforcement of section 1.218(a)(14). In the suit, Mr. Preminger claimed, <u>inter alia</u>, that section 1.218(a)(14) violates the First Amendment, both as applied to him and on its face. <u>Preminger v. Prinicipi</u>, 422 F.3d 815, 820 (9th Cir. 2005). After filing suit, Mr. Preminger moved for a preliminary injunction to prohibit enforcement of the regulation. <u>Id.</u> The district court denied the motion insofar as it related to Mr. Preminger's as-applied challenge, finding that Mr. Preminger had not met his burden of showing a likelihood of success on the merits. <u>Id.</u> As far as the facial challenge was concerned, the district court held that only this court has jurisdiction over such a challenge. <u>Id.</u> at 820-21.

Mr. Preminger appealed the denial of his motion for a preliminary injunction to the United States Court of Appeals for the Ninth Circuit. On August 25, 2005, the Ninth Circuit affirmed the ruling of the district court that Mr. Preminger had not shown a likelihood of success on the merits with respect to his as-applied challenge. <u>Id.</u> at 826. The circuit court also affirmed the district court's ruling that it lacked jurisdiction over Mr. Preminger's facial challenge to section 1.218(a)(14). <u>Id.</u> at 820-21. On October 14,

2006, Mr. Preminger's section 502 petition was docketed in this court. His as-applied challenge to section 1.218(a)(14) remains pending in the district court.

DISCUSSION

I.

Pursuant to 38 U.S.C. § 502, we have jurisdiction "to directly review the validity of both the rulemaking process and the challenged rules of the VA." Disabled Am. Veterans v. Gober, 234 F.3d 682, 688 (Fed. Cir. 2000). In pertinent part, section 502 states:

> An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers (other than an action relating to the adoption or revision of the schedule of ratings for disabilities adopted under section 1155 of this title) is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit.[3]

Therefore, our review is in accordance with Chapter 7 of the Administrative Procedure Act ("APA"), which directs us to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). In his petition pursuant to section 502, Mr. Preminger asserts that, in promulgating section 1.128(a)(14), the Secretary exceeded his authority and failed to comply with the requirements of notice and comment rulemaking. In addition, he argues that the regulation is unconstitutional on its face because it violates the First Amendment. We address the former contentions first.

---

[3] Section 552(a)(1), inter alia, requires agencies to publish in the Federal Register "rules of procedure . . . [and] substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." Section 553 outlines the requirements that must be met by an agency when it promulgates a regulation through notice and comment rulemaking.

II.

A.

Mr. Preminger contends that when section 1.128(a)(14) was promulgated, the Secretary exceeded his statutory authority. Section 1.128(a)(14) was promulgated pursuant to 38 U.S.C. § 901, which gives the Secretary authority to "prescribe regulations to provide for the maintenance of law and order and the protection of persons and property on Department property." Mr. Preminger argues that section 1.128(a)(14) covers the "content of private speech," and therefore "is not within the scope of the statutory authority to maintain law and order or to protect persons and property." Mr. Preminger further argues that Congress does not have the authority to grant the Secretary the authority to violate the First Amendment, which he asserts section 1.128(a)(14) does. The government responds that the regulation is within the Secretary's authority.

We reject Mr. Preminger's argument. We agree, of course, that Congress cannot authorize, nor can the VA promulgate, a regulation that violates the Constitution, and we address, in Part III, infra, whether section 1.218(a)(14) does violate the First Amendment. Assuming for present purposes that the regulation is constitutional, we agree with the government that its promulgation was within the Secretary's statutory authority.

As early as February of 1970, the Secretary promulgated predecessors to 38 C.F.R. § 1.218(a)(14), Conduct and Ceremonies, 35 Fed. Reg. 2389, 2389 (Feb. 3, 1970); Veterans Administration Cemeteries, 35 Fed. Reg. 2389, 2389-90 (Feb. 3,

1970), and in September of 1973, the Secretary promulgated another version of the regulation, which provided in relevant part:

> For the purpose of the prohibition expressed in this paragraph unauthorized demonstrations or services shall be defined as, but not limited to, . . . partisan activities which may be described as commentary or actions in support of, or in opposition to, or attempting to influence, any current policy of the Government of the United States, or any private group, association, or enterprise.

38 Fed. Reg. 24,364, 24,364-65 (Sept. 7, 1973). In 1973, section 901 gave the Secretary the power to "make all needful rules and regulations for the governing of the property under his charge and control." National Cemeteries Act of 1973, Pub. L. No. 93-43, § 4, 87 Stat. 75, 79 (codified as amended at 38 U.S.C. § 901 (2000)). As seen, the present version of section 901 gives the Secretary authority to "prescribe regulations to provide for the maintenance of law and order and the protection of persons and property on Department property." We think both versions of section 901 make it clear that Congress wanted the VA to have the ability to ensure that the activities of visitors to VA property not be disruptive of the VA's mission to provide services to veterans. See, e.g., VA Palo Alto Health Care System, http://www.palo-alto.med.va.gov/Mission.asp ("Mission Statement: Honor America's veterans by providing exceptional health care that improves their health and well-being.") (last visited June 17, 2007). Assuming its constitutionality, section 1.218(a)(14), which prohibits unauthorized demonstrations, is plainly within section 901's grant of authority.

B.

Mr. Preminger next argues that section 1.218(a)(14) is invalid because it has never been subjected to a notice and comment rulemaking process. See Farrell v. Dep't of Interior, 314 F.3d 584, 590 (Fed. Cir. 2002) ("If an agency policy statement is

intended to impose obligations or to limit the rights of members of the public, it is subject to the Administrative Procedure Act, and, with certain exceptions, must be published in the Federal Register as a regulation. If it is not, it is invalid." (citation omitted)). The VA's failure to subject section 1.218(a)(14) to notice and comment, Mr. Preminger contends, is a "continuing violation of the APA."[4]

The government responds that Mr. Preminger's APA challenge is untimely. According to the government, an APA claim such as Mr. Preminger's is subject to the six-year statute of limitations of 28 U.S.C. § 2401(a). Section 2401(a) provides that "every civil action against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The government contends this includes causes of action under the APA. Further, the government asserts, a cause of action seeking judicial review under the APA accrues at the time of final agency action. The government therefore reasons that because the Secretary promulgated section 1.218(a)(14) in September of 1973, see 38 Fed. Reg. at 24,364-65, and amended it in July of 1985, see 50 Fed. Reg. 29,226, 29,227-28 (July 18, 1985), the statute of limitations lapsed at the latest in July 1991, over fifteen years before the petition was filed in this case.

We agree with the government that Mr. Preminger's procedural challenge to the rule-making process of 38 C.F.R. § 1.218(a)(14) is time-barred. Our sister circuits have held that actions for judicial review under the APA are subject to the statute of limitations in 28 U.S.C. § 2401(a). See, e.g., Nagahi v. INS, 219 F.3d 1166, 1171 (10th Cir. 2000) ("In the absence of a specific statutory limitations period, a civil action against

---

[4] It is undisputed that section 1.218(a)(14) was not subjected to notice and comment when initially promulgated in 1973, or when amended in 1985.

the United States under the APA is subject to the six year limitations period found in 28 U.S.C. § 2401(a).”); Instituto de Educacion Universal Corp. v. U.S. Dep't of Energy, 209 F.3d 18, 21 (1st Cir. 2000) (“The notice of appeal was docketed on March 6, 1998, well within the six-year period allowed for seeking judicial review of the Secretary's final orders.”); Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 186 (4th Cir. 1999) (“[A] complaint under the APA for review of an agency action is a ‘civil action’ within the meaning of section 2401(a).” (quoting Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir. 1997))); Slater, 120 F.3d at 631 (same); Sierra Club v. Penfold, 857 F.2d 1307, 1315 (9th Cir. 1988) (“As a general statute of limitation, [section 2401(a)] should apply to actions brought under the APA which challenge a regulation on the basis of procedural irregularity.”).

Like the APA, section 502 does not contain its own statute of limitations. We hold that the statute of limitations in section 2401 applies to actions under section 502. We think this makes sense because, as seen, section 502 calls for review of VA rulemaking under the standards of the APA. At the same time, we reject Mr. Preminger's argument that the original failure to engage in notice and comment rulemaking with respect to the regulation represents a continuing violation of the APA. The government is correct that a cause of action seeking judicial review under the APA accrues at the time of final agency action. See Slater, 120 F.3d at 631 (“Under the APA, a right of action accrues at the time of ‘final agency action.’” (citing 5 U.S.C. § 704)). In addition, “[t]o determine when an agency action is final,” the Supreme Court has “looked to, among other things, whether its impact ‘is sufficiently direct and immediate’ and has a ‘direct effect on . . . day-to-day business.’” Franklin v.

Massachusetts, 505 U.S. 788, 798-99 (1992) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 152 (1967) (omission in original)); see also Lujan v. Nat'l Wildlife Fed., 497 U.S. 871, 890 (1990) (explaining that a rule or regulation is a final agency action). In this case, any APA cause of action accrued at the latest in July of 1985, when section 1.218(a)(14) was amended. There is no question that, as of that time, the regulation was in full force and effect and was operative. Moreover, were we to accept Mr. Preminger's continuing violation theory, there effectively would be no statute of limitations because the injury would always be ongoing. See Wind River Mining Corp. v. United States, 946 F.2d 710, 714 (9th Cir. 1991) (explaining that if every agency action allowed a challenge to a procedural violation in the adoption of the regulation, the statute of limitations would be nullified).

Mr. Preminger filed his 38 U.S.C. § 502 challenge to the promulgation of section 1.218(a)(14) on October 14, 2006, well over more than six years after the VA's last rulemaking in July of 1985. His APA rulemaking challenge therefore is barred by the statute of limitations.

III.

The main issue on appeal is Mr. Preminger's facial challenge to 38 C.F.R. § 1.218(a)(14). Section 1.218(a)(14) provides as follows:

> Demonstrations. (i) All visitors are expected to observe proper standards of decorum and decency while on VA property. Toward this end, any service, ceremony, or demonstration, except as authorized by the head of the facility or designee, is prohibited. Jogging, bicycling, sledding and other forms of physical recreation on cemetery grounds is prohibited.
>
> (ii) For the purpose of the prohibition expressed in this paragraph, unauthorized demonstrations or services shall be defined as, but not limited to, picketing, or similar conduct on VA property; any oration or similar conduct to assembled groups of people, unless the oration is part of an authorized service; the display of any placards, banners, or foreign

flags on VA property unless approved by the head of the facility or designee; disorderly conduct such as fighting, threatening, violent, or tumultuous behavior, unreasonable noise or coarse utterance, gesture or display or the use of abusive language to any person present; and <u>partisan activities, i.e., those involving commentary or actions in support of, or in opposition to, or attempting to influence, any current policy of the Government of the United States, or any private group, association, or enterprise</u>.

38 C.F.R. § 1.218(a)(14) (emphases added).

Mr. Preminger contends that the part of the regulation that deals with "partisan activities" (underlined above) is facially invalid because it contravenes the First Amendment.[5] The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. According to Mr. Preminger, because the regulation allows the VA to impose content-based restrictions without procedural safeguards, it vests unbridled discretion in the VA, is unreasonable, and thus unconstitutional. See City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 759 (1988) ("[W]e have previously identified two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and

---

[5] Mr. Preminger stated at oral argument that he may only raise a facial challenge in this court. We agree. As we stated in Gober, "under 38 U.S.C. § 502, we may review the VA's procedural and substantive rules, any amendments to those rules, and the process in which those rules are made or amended." 234 F.3d at 688. Judicial review of the VA's rules and the manner in which those rules were promulgated does not include the application of those rules to specific facts. See 38 U.S.C. § 502 (allowing for review of sections 552(a)(1) and 553, which relate to publishing rules and notice and comment rulemaking). If Congress had intended this court to review all agency actions, other sections of the APA such as 554, 556, and 557, covering adjudications, hearings, and initial agency decisions, respectively, would have been included within the scope of section 502's direct review. Furthermore, an as-applied challenge may require a court to make findings of fact. An appellate court is not equipped to do that.

correcting content-based censorship 'as applied' without standards by which to measure the licensor's action.").

The government argues first that Mr. Preminger's challenge to section 1.218(a)(14) is barred by the doctrine of stare decisis, in view of our decision in Griffin v. Secretary of Veterans Affairs, 288 F.3d 1309 (Fed. Cir. 2002). It is the government's position that this litigation involves a facial challenge to the same subsection of 38 C.F.R. § 1.218 that survived a facial challenge in Griffin. In making this argument, the government notes that section 1.218(a)(14) has not been revised or amended since Griffin. Alternatively, the government argues that section 1.218(a)(14) is constitutional on its face. We consider first the government's stare decisis argument.

A.

Stare decisis plays an important role "in preserving the rule of law and in ensuring that its evolution is not subverted by arbitrariness." Wilson v. United States, 917 F.2d 529, 537 (Fed. Cir. 1990). "Stare decisis in essence 'makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience to its decision. . . . It deals only with law, as the facts of each successive case must be determined by the evidence adduced at trial.'" Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1570 (Fed. Cir. 1993) (quoting 1B James Wm. Moore, Moore's Federal Practice, ¶ G401 (2d ed. 1993)). A prior precedential decision on a point of law by a panel of this court is binding precedent and cannot be overruled or avoided unless or until the court sits en banc. Sacco v. Dep't of Justice, 317 F.3d 1384, 1386 (Fed. Cir. 2003) (citing Newell Co. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988)).

In <u>Griffin</u>, Patrick J. Griffin, III, and Gregory S. Clemmer (together, "Griffin") brought a section 502 challenge to the facial validity of 38 C.F.R. § 1.218(a)(14). Griffin desired to have the Confederate flag flown daily at a cemetery in which approximately 3,300 Confederate soldiers who died at a Union prison camp are buried. <u>Griffin</u>, 288 F.3d at 1314. Griffin requested that the Confederate flag be flown in addition to the United States flag, as it previously had from 1994 to 1998. <u>Id.</u> at 1314-15. Citing section 1.218(a)(14), the VA refused to allow Griffin to display the flag. Griffin then filed suit in the United States District Court for the District of Maryland, challenging section 1.218(a)(14) as unconstitutional as applied to his request. <u>Id.</u> at 1315. His as-applied challenge was ultimately rejected by the United States Court of Appeals for the Fourth Circuit. <u>Id.</u> at 1316-17. Griffin also filed suit pursuant to section 502 in this court, challenging the facial validity of section 1.218(a)(14). <u>Id.</u> at 1316. He attacked the constitutionality of section 1.218(a)(14) through three theories: First, he claimed the regulation vests unbridled discretion in VA officials. Second, he argued the regulation lacks procedural safeguards as a licensing scheme. Third, he contended the regulation is void for vagueness. <u>Id.</u> at 1318.

In addressing Griffin's attack on section 1.218(a)(14), we focused our inquiry on the flag display clause and the cemetery-related portion of the regulation. <u>Id.</u> at 1322. In so doing, we stated that Griffin had not provided any "indication . . . that the VA ha[d] ever penalized a speaker for unauthorized orations or partisan activity on VA property." <u>Id.</u> at 1329. In addition, we noted that Griffin made "no allegation that section 1.218(a)(14) poses a risk of censorship at any VA property other than national cemeteries." <u>Id.</u> at 1322. Nor, we noted, did he allege that the regulation would "chill

speech in any venue other than national cemeteries." Id. at 1326. Thus, Griffin did not attack, and we did not consider, the "partisan activities" clause of section 1.218(a)(14), which is what is at issue in this case.

On the merits, we rejected Griffin's facial challenge. Id. at 1331. We first determined that VA cemeteries are nonpublic fora and noted that "we have no reasons to conclude that other VA property ought to be classified as a traditional or designated public forum." Id. at 1322. We then considered Griffin's unbridled discretion challenge in the context of a nonpublic forum and held that the discretion vested in VA officials by section 1.218(a)(14) is reasonable. Id. at 1325. Turning to Griffin's claim that, as a licensing scheme, the regulation lacks procedural safeguards, we held that the contention did not provide an "independent basis for striking down a regulation," and we reasoned that the procedural safeguards requirement had "little relevance to the present case" because it was mostly subsumed in the unbridled discretion inquiry. Id. at 1328. Moreover, we noted that "exclusions of speakers from nonpublic fora have been upheld despite a complete absence of established procedures for making such decisions." Id. (citing Ark. Educ. Televisions Comm'n v. Forbes, 523 U.S. 666 (1998); Greer v. Spock, 424 U.S. 828 (1976)). Finally, addressing Griffin's void for vagueness claim, we stated, "We cannot strike down section 1.218(a)(14) unless the regulation's vagueness poses a real and substantial threat to protected expression," and we noted that Griffin had "done no more than speculate that third parties, or even he himself, might be subject to criminal penalties for uttering the wrong words on VA property." Id. at 1329.

As noted above, Mr. Preminger's challenge does not ask us to decide the same question of law we decided in Griffin. Griffin only considered the flag display clause and

cemeteries. Furthermore, if we were to conclude that the partisan activities clause of section 1.218(a)(14) violates the First Amendment, as Mr. Preminger urges us to do, our decision would not conflict with <u>Griffin</u> because we could sever the "partisan activities" clause from the remainder of the regulation. The Supreme Court has stated that an invalid portion of a statute may be severed from the remainder of the statute and the remainder of the statute upheld as valid. "'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" <u>Buckley v. Valeo</u>, 424 U.S. 1, 108-09 (1976) (per curiam) (quoting <u>Champlin Refining Co. v. Corp. Comm'n of Okla.</u>, 286 U.S. 210, 234 (1932)). A similar approach applies in the case of a regulation. <u>See</u> <u>K-Mart Corp. v. Cartier, Inc.</u>, 486 U.S. 281, 293-95 (1988) (invalidating only the part of a regulation that conflicted with statutory language); <u>Massachusetts v. Sec'y of Health & Human Servs.</u>, 873 F.2d 1528, 1549-50 (1st Cir. 1989) (explaining that courts have generally inquired similarly for severability of statutes and regulations); <u>see also</u> <u>United States v. Booker</u>, 543 U.S. 220, 320 (2005) (Thomas, J., dissenting in part) ("I also assume that our doctrine on severability and facial challenges applies equally to regulations and to statutes." (citing <u>Reno v. Flores</u>, 507 U.S. 292, 300-01 (1993))).

In short, in this case we consider the "partisan activities" clause of section 1.218(a)(14). It is to that issue that we now turn.

B.

A challenge to the constitutionality of a regulation presents an issue of law, <u>see</u> <u>Terry v. Principi</u>, 340 F.3d 1378, 1381 (Fed. Cir. 2003), and we review the

constitutionality of a regulation without deference to the agency. Griffin, 288 F.3d at 1317. As noted, Mr. Preminger is mounting a facial challenge to the "partisan activities" clause of section 1.218(a)(14). A facial challenge to a statute or regulation is independent of the individual bringing the complaint and the circumstances surrounding his or her challenge. Griffin, 288 F.3d at 1317. Indeed, a facial challenge may be brought without a record or any facts at all. Flores, 507 U.S. 292, 300-01 (1993) ("We have before us no findings of fact, indeed no record, concerning the INS's interpretation of the regulation or the history of its enforcement. We have only the regulation itself and the statement of basis and purpose that accompanied its promulgation."). In contrast, an as-applied challenge is specific to the facts of the particular individual involved in the suit. United States v. Raines, 362 U.S. 17, 23-25 (1960) (holding a statute constitutional on its face when, although the statute might be unconstitutional as applied to private actors, the Court determined that it was constitutional as applied to public officials, and the parties challenging the law were public officials).

While prior restraints are presumed invalid, facial challenges to speech restrictions are generally disfavored, and a petitioner faces a heavy burden in advancing his or her claim. See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998). To prevail on his claim, Mr. Preminger must demonstrate that application of the "partisan activities" clause of section 1.218(a)(14) poses a real and substantial threat of the alleged censorship risks. See id.; City of Lakewood, 486 U.S. at 759. Armed with these precepts, we turn to the substance of Mr. Preminger's facial challenge to section 1.218(a)(14).

C.

Government restrictions on speech on public property are traditionally analyzed by classifying the regulated property as one of three kinds of fora described by the Supreme Court: public fora, designated public fora, and nonpublic fora. Griffin, 288 F.3d at 1321. Public fora have been "devoted to assembly and debate by long tradition or government fiat," examples being public streets and parks. Id.; see Grayned v. City of Rockford, 408 U.S. 104, 115 (1972) ("'Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public quests.'" (quoting Kunz v. New York, 340 U.S. 290, 293 (1951) (citation omitted))). In a public forum, exclusion of a speaker by the government must be narrowly drawn and necessary to serve a compelling government interest, meaning that the restriction is subject to strict scrutiny. Griffin, 288 F.3d at 1321. A designated public forum, on the other hand, is an area dedicated by the government for a certain class of speakers. Id. Exclusion of a speaker who is within the certain class must pass strict scrutiny; exclusion of a speaker outside the class must be reasonable and viewpoint neutral. See id. In a nonpublic forum, the government may restrict speech as long as the restriction is reasonable and viewpoint neutral. See id.

We begin the forum analysis with 38 U.S.C. § 901, the statute pursuant to which the Secretary promulgated the regulation at issue. As already seen, it states that "[t]he Secretary shall prescribe regulations to provide for the maintenance of law and order and the protection of persons and property on Department property." 38 U.S.C. § 901(a)(1). The statute defines "Department property" to mean "land and buildings that

are under the jurisdiction of the Department and are not under the control of the Administrator of General Services." Id. § 901(a)(2). Consistent with the statutory charge, section 1.218 states, in relevant part, that its rules and regulations "apply at all property under the charge and control of the VA (and not under the charge and control of the General Services Administration)." 38 C.F.R. § 1.218(a). The parties agree that VA Medical Centers, such as the Menlo Park Medical Center, constitute "property under the charge and control of the VA." Beyond that, however, they have not been able to enlighten us as to what other facilities are "under the charge and control of the VA" so as to be covered by the regulation. Nor have they been able to point us to authority that would help us answer the question. Under these circumstances, we will proceed in the following manner: For purposes of adjudicating Mr. Preminger's facial challenge to the "partisan activities" clause of section 1.218(a)(14), we will start from the premise that the relevant fora are VA Medical Centers, and we will consider the Menlo Park Medical Center to be typical of such facilities. See Griffin, 288 F.3d at 1322 (focusing on nonpublic fora national cemeteries and assuming the remainder of VA property was nonpublic when Griffin only argued regarding cemeteries).

Mr. Preminger states that the Menlo Park Medical Center and VA Medical Centers in general consist of buildings and outdoor, communal areas. He asserts that although some of the buildings are not generally open to the public, most are open. Focusing on the Menlo Park Medical Center, he tells us that the facility includes the largest open space in the city of Menlo Park, a regional bus stop, and various through streets and sidewalks. We are further informed that the Menlo Park Medical Center covers ninety-five acres, includes a teaching hospital, three nursing homes, and a

domiciliary for homeless veterans. Veterans are housed in numerous buildings on the Menlo Park Medical Center grounds, including Building 331, which Mr. Preminger sought to visit to register voters. On this basis, Mr. Preminger argues that VA Medical Centers are traditional public fora. He further argues that even if the grounds are not traditional public fora, the VA has intentionally opened the grounds for public discourse.

The government does not dispute Mr. Preminger's description of the Menlo Park Medical Center. It does contend, however, that the Medical Center is nonpublic property. The government relies on United States v. Kokinda, 497 U.S. 720 (1990) (plurality opinion), and Greer v. Spock to argue that VA campus streets and sidewalks are nonpublic fora because of their location in conjunction with other nonpublic fora and their purpose. The government further argues that VA property has not been expressly dedicated for expressive conduct. Cf. Widmar v. Vincent, 454 U.S. 263, 267-69 (1981) (finding designated fora when university opened facilities to student groups to foster the free exchange of ideas). The VA's mission, according to the government, "is to provide medical and other social services to long-term residents and visitors," which is far different from a university seeking to provide a robust educational experience, which was the case in Widmar. See id. The government concludes that the VA's mission does not comport with opening up its property as public or dedicated public fora.

We agree with the government that VA Medical Centers, exemplified by the Menlo Park Medical Center, constitute nonpublic fora. In Kokinda, 497 U.S. at 727, the Supreme Court addressed the question of whether a Postal Service regulation prohibiting "soliciting alms and contributions" on postal premises violated the First Amendment. The case came to the Court after two volunteers for the National

Democratic Policy Committee, who set up a table on the sidewalk near the entrance to the Bowie, Maryland, Post Office to solicit contributions and distribute political literature, were arrested and convicted of misdemeanors for violating the regulation. The United States Court of Appeals for the Fourth Circuit reversed the convictions. The circuit court held that the postal sidewalk was a traditional public forum. Having done so, it determined that the government had no significant interest in banning solicitation and that the regulation was not narrowly tailored to accomplish the asserted governmental interest. Id. at 724. After granting the government's petition for certiorari, the Supreme Court reversed the decision of the court of appeals. Id. at 737. The Court rejected the respondents' argument that although the sidewalk was on Postal Service property, because it was not distinguishable from the municipal sidewalk across the parking lot from the post office's entrance, it was a traditional public forum. Id. at 728-29. The Court held that the sidewalk was not a public forum, noting that the sidewalk was constructed solely to assist postal patrons in negotiating the space between the post office parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city. Analyzing the regulation under the standards applicable to nonpublic fora, the Court held that the regulation was reasonable. Id. at 737.

In its Kokinda forum analysis, the Court relied upon Greer v. Spock. See Kokinda, 497 U.S. at 729. In Greer, the Court held that even though a military base permitted free civilian access to certain unrestricted areas, the base was a nonpublic forum. The Court determined that the presence of sidewalks and streets within the base did not require a finding that the base was a public forum. Greer, 424 U.S. at 835-

37; see also Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 134 (1977) (finding prison facilities not public fora despite being open to some groups consistent with the prison's rehabilitative mission).

Kokinda, Greer, and Jones are consistent with two important principles: first, "[t]he Government's ownership of property does not automatically open that property to the public," Kokinda, 497 U.S. at 727 (citing U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981)); and second, "[t]he mere physical characteristics of . . . property cannot dictate forum analysis," id. Rather, the forum analysis requires consideration not only of whether government property has been opened to the public, see United States v. Grace, 461 U.S. 171, 178 (1983), but also of the nature and purpose of the property at issue. See Int'l Soc'y For Krishna Consciousness v. Lee, 505 U.S. 672, 679 (1992) ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."); Grace, 461 U.S. at 178 ("The government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" (quoting Adderly v. Florida, 385 U.S. 39, 47 (1966))).

We conclude that VA Medical Centers, of which the Menlo Park Medical Center is an example, are, for First Amendment purposes, nonpublic fora. In our view, the fact that the public has been given access to the Menlo Park Medical Center and that the Medical Center has a regional bus stop, through streets and sidewalks, and the largest open space in the city of Menlo Park, is outweighed by the nature and purpose of the

Medical Center. At the Medical Center, the government is acting in a proprietary capacity to further the mission of the VA in general and the Medical Center in particular. The mission of the VA is to provide health care and services for veterans and their families. See Veterans' Compensation, Education, and Employment Amendments of 1982, Pub. L. No. 97-306, § 409(a), 96 Stat. 1429, 1446 ("It is the policy of the United States that the Veterans' Administration [now the Department of Veterans Affairs]—'(1) shall maintain a comprehensive, nationwide health-care system for the direct provision of quality health-care services to eligible veterans . . . .'"); United States Department of Veterans Affairs, Mission, Vision, Core Values & Goals, http://www.va.gov/about_va/mission.asp ("Mission Statement—'To care for him who shall have borne the battle and for his widow and his orphan.'") (last visited June 17, 2007). At the same time, the mission of the Menlo Park Medical Center is to "Honor America's veterans by providing exceptional health care that improves their health and well-being." VA Palo Alto Health Care System, Mission Statement, http://www.palo-alto.med.va.gov/Mission.asp (last visited June 17, 2007). Consistent with these missions, the Menlo Park Medical Center "operates nearly 900 beds, including three nursing homes and a 100-bed homeless domiciliary[,] all to serve more than 85,000 enrolled veterans." VA Palo Alto Health Care System, About Us, http://www.palo-alto.med.va.gov/about.asp (last visited June 17, 2007). The Menlo Park Medical Center offers health care services in a broad range of areas, including services to homeless veterans, post traumatic stress disorder programs, and recreation therapy. VA Palo Alto Health Care System, Menlo Park, http://www.va.gov/directory/guide/facility.asp?ID=5195 (last visited June 17, 2007). In

sum, although the Menlo Park Medical Center has "public" areas, the VA has not made the Medical Center available as a forum for First Amendment activity. See, e.g., Kokinda, 497 U.S. at 730 ("The Postal Service has not expressly dedicated its sidewalks to any expressive activity. Indeed, postal property is expressly dedicated to only one means of communication: the posting of public notices on designated bulletin boards."). Rather, the Menlo Park Medical Center serves the purpose of providing medical services to veterans. Although the VA has allowed public access to some portion of the Medical Center grounds, the VA has not thereby disavowed its purpose of providing medical care for veterans for that portion of the grounds and dedicated that portion of the grounds to the public. Cf. Greer, 424 U.S. at 837 ("[T]he Fort Dix authorities had not abandoned any claim of special interest in regulating the distribution of unauthorized leaflets or the delivery of campaign speeches for political candidates within the confines of the military reservation."). We hold that the Menlo Park Medical Center is a nonpublic forum.

D.

In a nonpublic forum, "the government may restrict access by content or speaker identity, so long as the restrictions are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Griffin, 288 F.3d at 1321 (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985)). Thus, restraints on speech in a nonpublic forum "will be upheld unless they are unreasonable or they embody impermissible view-point discrimination." Id. As part of the reasonableness inquiry, we consider whether the discretion vested in public officials "is necessary to preserve the function and character of the forum." Id. at 1323.

We hold that the restriction on "partisan activities" by "visitors" found in 38 C.F.R. § 1.218(a)(14) is reasonable and viewpoint neutral. The VA must be able to maintain a place of healing and rehabilitation for the veterans for which it provides services. Demonstrations and other disruptions could interfere with the VA's ability to provide those services and could impede the VA's ability to carry out its mission of caring for veterans. In light of these considerations, we cannot say that it is unreasonable for the VA to regulate the activities taking place on its grounds and to exercise its discretion in determining when a "demonstration" (defined to include "partisan activities") would be disruptive. See Griffin, 288 F.3d at 1325 ("Mr. Griffin has not convinced us that preserving the national cemetery for the government's own expressive purposes can be accomplished without vesting a significant degree of discretion in VA facility heads.").

We think the VA must have, as part of its discretion, the ability to determine the disruption that would be caused by an authorized partisan activity, as well as by any additional partisan activity that would have to be authorized in order to prevent the agency from engaging in viewpoint discrimination. In other words, as part of its discretion, the VA must be able to decide when its mission would be compromised to an extent that counsels against granting the request to conduct a demonstration. We do not agree with Mr. Preminger that section 1.218(a)(14) provides the VA with standardless, unbridled discretion.

The regulation requires "[a]ll visitors . . . to observe proper standards of decorum and decency while on VA property." 38 C.F.R. § 1.218(a)(14)(i). Toward that end, "any . . . demonstration, except as authorized by the head of the facility or designee, is prohibited." Id. The regulation defines "unauthorized demonstrations" as, among other

things, "disorderly conduct such as fighting, threatening, violent, or tumultuous behavior, unreasonable noise or coarse utterance, gesture or display or the use of abusive language to any person present." 38 C.F.R. § 1.218(a)(14)(ii). The intent of the regulation is to give the head of a facility such as the Menlo Park Medical Center the authority to decide whether a particular demonstration would impede the ability of the facility to achieve its mission of providing health care and services for veterans and their families. The regulation on its face defines those demonstrations that may be prohibited and thus provides clear standards to guide the facility head in the exercise of his or her discretion. Indeed, section 1.218(a)(14)(ii) is in harmony with the more general regulatory ban on "Disturbances" on VA property found in 38 C.F.R. § 1.218(a)(5). Section 1.218(a)(5) defines disturbances to include, inter alia, "[c]onduct . . . which creates loud or unusual noise; which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; which otherwise impedes or disrupts the performance of official duties by Government employees; which prevents one from obtaining medical or other services provided on the property in a timely manner; or [which involves] the use of loud, abusive, or otherwise improper language."

In view of the existing specific, objective regulatory standards, the discretion given to a VA facility head to authorize or refuse to authorize a particular demonstration under section 1.218(a)(14) is not unbridled. In deciding whether to authorize a proposed demonstration, a VA facility head is to be guided by the specific standards set forth in 38 C.F.R. § 1.218(a)(14)(ii). See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S. Ct. 935, 938 (1969) (stating that a regulation prohibiting a "public

demonstration" without first obtaining a permit from city officials was invalid as originally written because "the prior restraint of a license [without specified] standards to <u>guide</u> the licensing authority is unconstitutional" (emphasis added)); <u>see also</u> <u>City of Lakewood</u>, 486 U.S. at 769-70, 108 S. Ct. at 2151 ("To allow . . . illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal." (citing <u>Shuttlesworth</u>, 394 U.S. at 150-51, 89 S. Ct. at 938-39)).

Because adequate standards to guide the VA's exercise of discretion under section 1.218(a)(14) exist, the regulation does not present either of the First Amendment risks associated with "unbridled discretion" that the Supreme Court identified in <u>City of Lakewood</u>. 486 U.S. at 759, 108 S. Ct. at 2145. First, visitors to VA property can readily determine whether proposed demonstrations will be deemed disruptive. Thus, there is little risk that potential speakers will self-censor in order to avoid being denied a license to speak. <u>Id.</u> Second, the district court adjudicating Mr. Preminger's as-applied challenge has standards to which it can look in order to test whether Mr. Preminger was excluded from the Menlo Park Medical Center on account of his political affiliation, as he alleges. Therefore, the regulation does not present the risk of "the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's actions." <u>Id.</u>

Mr. Preminger nevertheless argues that, even assuming VA Medical Centers are nonpublic fora, section 1.218(a)(14) fails constitutional muster because it allows the VA to cut off all electioneering and policy discussion without any alternative means of

communication.  He thus contends that the regulation is overbroad.  In making this

arguments he relies on Lee v. International Society for Krishna Consciousness, 505

U.S. 830 (1992), and Board of Airport Commissioners v. Jews for Jesus, 482 U.S. 569

(1987).

In Lee v. International Society for Krishna Consciousness,[6] the Supreme Court

held that a Port Authority of New York and New Jersey regulation banning "leafletting"—

the "continuous or repetitive . . . distribution of . . . printed or written material"—in a

nonpublic forum was not reasonable and violated the First Amendment.  Soc'y for

Krishna Consciousness, 505 U.S. at 690 (O'Connor, J., concurring in No. 91-155 and

concurring in judgment in No. 91-339).  Lee v. Society for Krishna Consciousness was

directed solely at leafletting.  See 505 U.S. at 675-76 ("The following conduct is

prohibited . . . distribution of flyers, brochures, pamphlets, books or any other printed or

written material . . . .").  And the Port Authority did not offer "any justification or record

---

[6]    International Society for Krishna Consciousness v. Lee, 505 U.S. 672
(1992), and Lee v. International Society for Krishna Consciousness, 505 U.S. 830
(1992) (per curiam), both dealt with the same regulation, which banned both soliciting
and leafletting.  The circuit court had upheld the ban on soliciting but struck down the
ban on leafletting.  The International Society for Krishna Consciousness petitioned for
certiorari and the respondent cross-petitioned for certiorari, which were both granted by
the Court.  Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. at 677.  International
Society for Krishna Consciousness v. Lee resulted in a majority opinion by Chief Justice
Rehnquist, upholding the ban on soliciting.  Justice O'Connor wrote separately and
explained that she would uphold the ban on soliciting but would strike down the ban on
leafletting.  Id. at 685 (O'Connor, J., concurring in No. 91-155 and concurring in
judgment in No. 91-339).  Justice O'Connor's opinion is essentially the controlling
opinion for Lee v. International Society for Krishna Consciousness, because that opinion
was per curiam and merely referenced the opinions in International Society for Krishna
Consciousness v. Lee.  See Lee v. Int'l Soc'y for Krishna Consciusness, 505 U.S. at
831 ("For the reasons expressed in the opinions of Justice O'CONNOR, Justice
KENNEDY, and Justice SOUTER, the judgment of the Court of Appeals holding that the
ban on distribution of literature in the Port Authority airport terminals is invalid under the
First Amendment is Affirmed." (citations omitted)).

evidence to support its ban on the distribution of pamphlets alone." Id. at 691 (O'Connor, J., concurring in No. 91-155 and concurring in judgment in No. 91-339). Mr. Preminger reads Lee v. Society for Krishna Consciousness as standing for the proposition that banning leafletting is a per se violation of the First Amendment. However, in addressing a facial overbreadth challenge, we must look to both the breadth of the regulation and also the activities it prohibits that are properly restricted by the regulation. See Virginia v. Hicks, 539 U.S. 113, 119-20 (2003) ("[W]e have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation." (citation omitted)). Section 1.218(a)(14) requires visitors to receive authorization for many activities, besides leafletting, that may very well interfere with the VA's mission. Thus, section 1.218(a)(14) cannot be said to be substantially overbroad because Mr. Preminger can point to one factual circumstance in which the regulation may be applied unconstitutionally.[7] Because section 1.218(a)(14) reasonably regulates activities that would interfere with the VA's mission, Lee v. Society for Krishna Consciousness does not help Mr. Preminger.

In Jews for Jesus, the Court was confronted with a resolution promulgated by the Board of Airport Commissioners for Los Angeles International Airport ("LAX"). The resolution provided in pertinent part: "[T]he Central Terminal Area at Los Angeles International Airport is not open for First Amendment activities by any individual and/or

---

[7] If the VA attempted to enforce section 1.218(a)(14) against a leafletter, as suggested by Mr. Preminger, that would be appropriate for an as-applied challenge in which a court would determine whether the distribution was a demonstration and whether the application of the regulation in that circumstance was reasonable.

entity." Jews for Jesus, 482 U.S. at 570-71. In short, the resolution banned all First Amendment activity, creating a "First Amendment Free Zone." Id.

A minister for Jews for Jesus, a nonprofit religious corporation, who was distributing free religious literature in the Central Terminal Area of LAX, was stopped by an airport peace officer. The officer provided the minister with a copy of the resolution, explained that he was violating it, and requested that the minister leave LAX. Id. at 571. Jews for Jesus filed suit in the United States District Court for the Central District of California, challenging the resolution as unconstitutional, both on its face and as applied to Jews for Jesus, contending that it banned all speech in a public forum. Id. at 572. Jews for Jesus also alleged that the resolution was unconstitutionally vague and overbroad. Id. The district court agreed with Jews for Jesus that the Central Terminal Area was a public forum and that the resolution was facially unconstitutional under the First Amendment. Id. The district court did not reach Jews for Jesus' other arguments. Id. The United States Court of Appeals for the Ninth Circuit affirmed. Id. After granting certiorari, the Supreme Court held that the resolution was "substantially overbroad" and "not fairly subject to a limiting construction." Id. In reaching its holding, the Court pointed out that the resolution did "not merely regulate expressive activity . . . that might create problems such as congestion or the disruption of the activities of those who use [the airport]," but that it prohibited all First Amendment activity. Id. at 574. The Court stated, in addition, that it thought it is "obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." Id. at 575.

The regulation at issue in this case differs markedly from the resolution before the Court in Jews for Jesus. The "partisan activities" clause of section 1.218(a)(14) only applies to "demonstrations," which presumably would cause disruptions at VA Medical Centers.[8] We have no difficultly concluding that, for First Amendment purposes, section 1.218(a)(14) is not overbroad.

Even if the regulation were deemed to reach constitutionally protected activity as argued by Mr. Preminger, we cannot say that that alone would render the regulation "substantially overbroad" so as to warrant facial invalidation. See id. at 1321; see also Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973) ("Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.").

We also have no difficulty concluding that section 1.218(a)(14) is viewpoint neutral. The regulation is clear on its face. It requires authorization for any partisan activity, whether for or against "current policy of the Government of the United States, or any private group, association, or enterprise." 38 C.F.R. § 1.218(a)(14). In our view, the regulation is non-discriminatory.

E.

Finally, Mr. Preminger advances two additional arguments as to why section 1.218(a)(14) violates the First Amendment. First, he asserts that the "administrative

---

[8]     Whether Mr. Preminger's registering of voters is a "demonstration" within the meaning of section 1.218(a)(14) is a factual question beyond the scope of this facial challenge.

record"[9] shows that, in its promulgation of the 1970 version of the regulation, the VA wanted to target mass demonstrations, and he contends that the VA's enforcement of the regulation against him has no rational basis. Next, he contends that the VA cannot restrict his access to the Medical Center based solely on his affiliation with a political party.

The short answer to these arguments is that they belong in district court, not before us. That is because these arguments are part and parcel of the as-applied challenge that is pending in the Northern District of California. In other words, whether Mr. Preminger's conduct was a "demonstration" under the regulation and whether he was excluded because of his party affiliation are factual questions that are not part of his facial challenge. They are part of his as-applied challenge. See Flores, 507 U.S. at 300-01; Griffin, 288 F.3d at 1322.

In sum, because VA property, exemplified by the Menlo Park Medical Center, constitutes nonpublic fora and because section 1.218(a)(14) is reasonable and viewpoint neutral, it does not, on its face, violate the First Amendment.

## CONCLUSION

For the forgoing reasons, we deny Mr. Preminger's petition to invalidate 38 C.F.R. § 1.218(a)(14).

## COSTS

Each party shall bear its own costs.

## DENIED

---

[9] The "administrative record" to which Mr. Preminger refers includes VA documents relating to the promulgation of the regulation in 1970 and in 1973 and relating to the amendment of the regulation in 1985.