**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee*,

v.

WILLIAM J. SZABO,
      *Defendant-Appellant*.

No. 12-10520

D.C. No.
2:12-cr-00206-
MCE-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., Chief District Judge, Presiding

Argued and Submitted
October 9, 2013—San Francisco, California

Filed July 28, 2014

Before: Dorothy W. Nelson, Milan D. Smith, Jr.,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Partial Concurrence and Partial Dissent by
Judge D.W. Nelson

**SUMMARY**[*]

**Criminal Law**

The panel affirmed the district court's judgment with regard to the defendant's as-applied constitutional challenges to 38 C.F.R. § 1.218(a)(5), and dismissed for lack of jurisdiction his facial challenge to the regulation, in a case in which the defendant was convicted of disorderly conduct in violation of § 1.218(a)(5), which prohibits causing "disturbances" at Veterans Affairs facilities.

Rejecting the defendant's as-applied First Amendment challenge, the panel held that the conduct for which the defendant was convicted does not constitute protected speech because it involved a "true threat" of violence. The panel held that even if the defendant's conduct did constitute protected speech, § 1.218(a)(5) would not be unconstitutional as applied to his conduct because it is a viewpoint neutral regulation, and prohibiting a visitor from yelling obscenities and threatening physical violence is eminently reasonable in view of the government's legitimate interest in caring for veteran patients and not triggering adverse psychological reactions from such patients.

Rejecting the defendant's contention that § 1.218(a)(5) is vague in violation of the Due Process Clause of the Fifth Amendment, as applied to him, the panel held that the defendant's actions unambiguously fall within the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

regulation's prohibition on "loud" and "abusive" language and on "conduct . . . which creates loud or unusual noise."

The panel dismissed for lack of jurisdiction the defendant's facial overbreadth challenge to the regulation because 38 U.S.C. § 502 states that facial challenges to the validity of VA regulations may be brought on in the Federal Circuit. The panel held that § 502's jurisdictional bar does not violate the defendant's right to due process.

Concurring in part and dissenting in part, Judge Nelson disagreed with the majority's holding that this court lacks jurisdiction to hear the defendant's overbreadth challenge.

## COUNSEL

Douglas Beevers (argued), Assistant Federal Defender, Joseph Schlesinger, Acting Federal Defender, Heather E. Williams, Acting Federal Defender, and Zachary Schultz, Certified Law Student, Office of the Federal Defender, Sacramento, California, for Defendant-Appellant.

Ashwin Janakiram (argued), Special Assistant United States Attorney, Benjamin Wagner, United States Attorney, and Camil Skipper, Appellate Chief, Office of the United States Attorney, Sacramento, California, for Plaintiff-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant William J. Szabo appeals from his judgment of conviction under Title 38, Code of Federal Regulations, Section 1.218(a)(5), arguing that the regulation violates the First and Fifth Amendments, both facially and as applied to his conduct. With regard to Szabo's as-applied challenges, we affirm the judgment of the district court. We dismiss Szabo's facial challenge for lack of jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

Szabo is a veteran who qualifies to receive services at Veterans Affairs (VA) facilities. Prior to August 29, 2011, Szabo was a patient at the Sacramento VA Medical Center outpatient mental health clinic (the VA Hospital). As a result of his prior behavioral problems at the VA Hospital, Szabo was required to have a police escort when he visited the facility, and he was only permitted to be treated by one particular physician.

On August 29, 2011, Szabo arrived at the VA Hospital and asked to see his doctor. He was accompanied only by his brother. A receptionist, who was familiar with Szabo, asked if Szabo had checked in with the VA police, and informed Szabo that he did not have an appointment.[1] In response, Szabo became angry, clenched his fists, and yelled "I don't need [the] fuckin' VA police. I don't need nobody to show me around. I've – I just want to see my doctor." When the

---

[1] There is a dispute as to whether Szabo initially had an appointment that was rescheduled or cancelled.

receptionist told Szabo that his doctor was not in, Szabo yelled "I don't need to see his pussy ass anyway, just you know, give me another fuckin' doctor." Szabo proceeded to call the receptionist "a cocksucker [], a motherfucker, and a faggot ass son of a bitch." His yelling was so loud that it caused patients to move into the hallway and was audible on other floors. VA security was dispatched to respond.

As the receptionist waited for security to arrive, Szabo threatened that he would "kick [the receptionist's] ass, [his] pussy ass, [his] fucking pussy ass . . . and [the Dr.'s] pussy ass." While making these threats, Szabo was "flailing his arms, [] leaning . . . over the counter[,] yelling in the face of . . . the receptionist[] . . . . slamm[ing] [a stack of papers] to the counter, and . . . slamming his hands [on the counter]." The receptionist feared for his safety and the other patients' safety, and when the security officer arrived, the receptionist left the reception area.

The security officer attempted to calm Szabo and to persuade Szabo to go outside. In response Szabo yelled "[a]t the top of his lungs": "[F]uck you, you queer ass, faggot ass, motherfucker, I'll kick your ass." A number of patients left the area. The security officer asked Szabo to calm down two or three additional times, and Szabo's brother attempted to "coax him out[side.]" When these efforts were unsuccessful, the security officer called the police.

While the security officer was contacting the police, Szabo started to walk outside. The police arrived about two minutes later and requested several times that Szabo sit on the curb while the security officer explained the situation to them. Szabo did not comply with the officers' instructions and continued to yell obscenities. When Szabo pushed one of

the officers, a struggle ensued. Szabo was ultimately sprayed with pepper spray and placed in handcuffs.

Following a bench trial, Szabo was convicted of one count of disorderly conduct, in violation of Title 38, Code of Federal Regulations, Section 1.218(a)(5), which prohibits causing "disturbances" at VA facilities. Pursuant to the regulation, "disturbances" are defined as:

> Conduct on property which creates loud or unusual noise; which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; which otherwise impedes or disrupts the performance of official duties by Government employees; which prevents one from obtaining medical or other services provided on the property in a timely manner; or the use of loud, abusive, or otherwise improper language; or unwarranted loitering, sleeping, or assembly. . .

38 C.F.R. § 1.218(a)(5). Szabo was sentenced to three years of supervised release, fifty hours of community service, and a ten dollar special assessment. He timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the judgment of the district court under 28 U.S.C. § 1291. We review questions of law de novo. *United States v. Thoms*, 684 F.3d 893, 898 (9th Cir. 2012). "The existence of subject matter jurisdiction is a question of law that we review de novo." *Hamad v. Gates*, 732 F.3d 990, 995 (9th Cir. 2013).

## DISCUSSION

Szabo argues that 38 C.F.R. § 1.218(a)(5) violates the First Amendment and the Fifth Amendment both facially and as applied to his conduct.**[2]** We reject Szabo's as-applied challenges, and we lack jurisdiction to consider his facial challenge.

## I.   As-Applied Challenges

Szabo argues that 38 C.F.R. § 1.218(a)(5) is unconstitutional as applied to him, because (1) the conduct for which he was convicted constitutes protected First Amendment speech; and (2) 38 C.F.R. § 1.218(a)(5) is vague in violation of the Due Process Clause of the Fifth Amendment. We reject both arguments.

---

**[2]** Szabo further argues that the district court erred in excluding expert testimony regarding his mental illness, through which he sought to advance a theory that his psychological condition prevented him from fully considering his actions. The district court did not abuse its discretion in excluding this expert testimony. *See United States v. Anderson*, 741 F.3d 938, 949 (9th Cir. 2013) (stating that we review evidentiary rulings for abuse of discretion).

In some cases, evidence of a criminal defendant's mental health will support a diminished capacity defense. *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988). But diminished capacity defenses are not available to defendants who are accused of general intent crimes. *United States v. Vela*, 624 F.3d 1148, 1154 (9th Cir. 2010). Violations of 38 C.F.R. § 1.218(a)(5) are crimes of general intent. *See United States v. Martinez*, 49 F.3d 1398, 1401 (9th Cir. 1995) ("When a statute does not contain any reference to intent, general intent is ordinarily implied."). For this reason, expert testimony regarding Szabo's diminished capacity was not relevant to his defense, and the district court did not err in excluding this testimony.

## A.  Protected Speech

### 1.  Legal Standard

The right to speak is not unlimited, and the degree of scrutiny that we apply to challenged speech "varies depending on the circumstances and the type of speech at issue." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Speech that threatens a person with violence is not protected by the First Amendment. *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002) ("[W]hile advocating violence is protected, threatening a person with violence is not."); *see also Watts v. United States*, 394 U.S. 705, 708 (1969). "*Threats*, in whatever forum, may be . . . proscribed without implicating the First Amendment." *Planned Parenthood*, 290 F.3d at 1076, n.11 (collecting cases).

Where protected speech is at issue, the degree to which the government may regulate such speech depends on the nature of the forum. *Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). VA medical facilities are "non-public" fora, *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008), and the government's power to regulate speech "is at its greatest when regulating speech in a non-public forum," *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46 (1983)). For this reason, restrictions on speech in VA medical facilities do not violate the First Amendment so long as they are (1) reasonable in light of the purpose served by the forum

and (2) viewpoint neutral. *United States v. Kokinda*, 497 U.S. 720, 730 (1990); *Peake*, 552 F.3d at 765.

In the context of restrictions on speech, reasonableness concerns "the purpose of the forum and all the surrounding circumstances." *Peake*, 552 F.3d at 765. While there must be more than "a rational basis" for a restriction on speech, the restriction "need not constitute the least restrictive alternative available." *Id.* at 766. We have recognized that patients at VA medical facilities "have significant health care needs," which justify the government's prohibiting conduct that diverts attention and resources from patient care. *Id.* "In a nonpublic forum, the First Amendment does not forbid . . . exclusion of speakers who would disrupt [the forum] and hinder its effectiveness for its intended purpose." *Id.* (internal quotations and alterations omitted).

Even reasonable restrictions on speech must be applied for "viewpoint-neutral reasons." *Principi*, 422 F.3d at 825. "[I]n a nonpublic forum, the government has 'the right to make distinctions in access on the basis of subject matter and speaker identity,' as long as the distinctions are not 'an effort to suppress expression merely because public officials oppose the speaker's view.'" *Peake*, 552 F.3d at 767 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46, 49).

## 2. Application

The conduct for which Szabo was convicted does not constitute protected speech, because his conduct involved a "true threat" of violence. *Planned Parenthood*, 290 F.3d at 1072 (citing *Watts*, 394 U.S. at 707). Szabo threatened to "kick [the] pussy ass" of the receptionist, his doctor, and a VA security guard. While making this threat, he was yelling

at the top of his lungs, "flailing his arms, [] leaning . . . over the counter[,] yelling in the face of . . . the receptionist[] . . . . slamm[ing] [a stack of papers] to the counter, and . . . slamming his hands." Szabo's actions put VA employees and other patients in fear for their safety, and the First Amendment does not protect such conduct.

However, even if Szabo's conduct did constitute protected speech, 38 C.F.R. § 1.218(a)(5) would not be unconstitutional as applied to his conduct. It is undisputed that 38 C.F.R. § 1.218(a)(5) is a viewpoint neutral regulation. Accordingly, the only pertinent question is whether its application to Szabo's conduct is "reasonable in light of the purpose served by the [VA hospital]." *Peake*, 552 F.3d at 765.

The government asserts that it seeks to prohibit disturbances such as Szabo's, because (1) the purpose of VA facilities is to serve and care for veterans, (2) many veterans have heightened sensitivities, and (3) disturbances, including loud noises, can trigger psychological reactions from the VA patient population. The government's interest in caring for veteran patients and not triggering adverse psychological reactions from such patients is plainly a legitimate government interest. Accordingly, prohibiting a visitor from yelling obscenities and threatening physical violence is eminently reasonable in view of this goal.

## B. Vagueness

### 1. Legal Standard

A statute or regulation is impermissibly vague under the Due Process Clause of the Fifth Amendment if it "fails to provide a person of ordinary intelligence fair notice of what

is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Humanitarian Law Project*, 561 U.S. at 18–19 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). So long as the challenged terms "are clear in their application to [the defendant's] conduct . . . [his] vagueness challenge must fail." *Humanitarian Law Project*, 561 U.S. at 21.

### 2. Application

As discussed above, Szabo threatened to harm the receptionist, his doctor, and a VA security guard using violent and profane language. In so doing, he yelled at the top of his lungs and engaged in threatening behavior. These actions put patients and employees in fear for their safety, and caused them to leave the reception area.

Szabo's actions unambiguously fall within 38 C.F.R. § 1.218(a)(5)'s prohibition on "loud" and "abusive" language and on "conduct . . . which creates loud or unusual noise." Accordingly, the regulation is not unconstitutionally vague with regard to Szabo's conduct. For these reasons, Szabo's as-applied challenges to the regulation fail.

## II. Facial Challenge

Szabo further argues that we should invalidate 38 C.F.R. § 1.218(a)(5) because it is facially overbroad. In making this

argument, Szabo does not assert that his own conduct was constitutionally protected. Rather, he argues that we should set aside the regulation because at some point in the future it might reach others' constitutionally protected conduct. We dismiss this challenge for lack of jurisdiction.

## A.  Legal Standard

### 1.  Overbreadth

A constitutional challenge based on overbreadth is a challenge to the facial validity of a statute or regulation. While an overbreadth challenge may be brought where a statute is constitutional as applied to the individual challenging it, such challenges are exceptions to the ordinary standing requirements, and are not "casually employed." *L.A. Police Dep't v. United Reporting Publ'g. Corp.*, 528 U.S. 32, 38–40 (1999).

"Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, [the Supreme Court] ha[s] recognized that the overbreadth doctrine is 'strong medicine' and ha[s] employed it with hesitation, and then 'only as a last resort.'" *Id.* (citations omitted). "[P]articularly where conduct and not merely speech is involved," a statute will not be invalidated as unconstitutionally overbroad unless it "reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 770–71 (1982).

### 2.  Jurisdiction

Although federal courts generally have jurisdiction to consider facial challenges to agency regulations, 5 U.S.C. § 702, we lack jurisdiction to consider the facial validity of a VA regulation that is constitutional as applied to the individual challenging it.

Chapter 7 of the Administrative Procedure Act (APA) provides that "[t]he form of proceeding for judicial review [of agency action] is the special statutory review proceeding relevant to the subject matter *in a court specified by statute*." 5 U.S.C. § 703 (emphasis added). "[So long as] Congress provides for a 'special statutory review proceeding' in one specific court, challenges to the administrative action must take place in the designated forum." *Principi*, 422 F.3d at 821 (quoting 5 U.S.C. § 703). For this reason, the facial validity of a regulation may only be raised outside of the designated forum when that forum is somehow inadequate. *See* 5 U.S.C. § 703; *see also F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468–69 (1984).

38 U.S.C. § 502 mandates that challenges to the facial validity of VA regulations must take place in the United States Court of Appeals for the Federal Circuit. *Principi*, 422 F.3d at 821; *Chinnock v. Turnage*, 995 F.2d 889, 893 (9th Cir. 1993); *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1305 (Fed. Cir. 2008). The statute provides:

> An action of the [VA] Secretary to which section 552(a)(1) [of the APA] . . . refers . . . is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 *and*

> *may be sought only in the United States Court*
> *of Appeals for the Federal Circuit.*

38 U.S.C. § 502 (emphasis added).[3]

Prior to 1988, veterans were precluded from obtaining *any* judicial review of decisions made by the VA. To remedy this perceived problem, Congress passed the Veterans' Judicial Review Act, Pub. L. 100-687, 102 Stat. 4105 (1988), which authorizes judicial review of VA decisions and centralizes such review in the Federal Circuit. According to the House Committee Report, the Federal Circuit was given exclusive jurisdiction over VA actions to ensure national uniformity in the status of those regulations and to allow a single court to develop subject matter expertise. H.R. Rep. No. 100-963, at 28 (1988) (expressing Congress's intent "to avoid the possible disruption of VA benefit administration which could arise from conflicting opinions on the same subject due to the availability of review in the 12 Federal Circuits or the 94 Federal Districts" and stating that "the subject of veteran benefits rules and policies is one that is well suited to a court which has been vested with other types of specialized jurisdiction").

Because 38 U.S.C. § 502 plainly states that facial challenges to the validity of VA regulations may be brought

---

[3] Section 552(a)(1) of the APA requires agencies to publish in the Federal Register "rules of procedure . . . [and] substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." There is no dispute that 38 C.F.R. § 1.218(a)(5) is a regulation published in the Federal Register. 50 Fed. Reg. 29, 226 (July 18, 1985).

only in the Federal Circuit, we do not have jurisdiction to consider the facial validity of 38 C.F.R. § 1.218(a)(5).

### 3. Sufficiency of Review

Our dissenting colleague argues that although 38 U.S.C. § 502 only authorizes the Federal Circuit to consider facial challenges to VA regulations, we should nonetheless consider Szabo's request to invalidate 38 C.F.R. § 1.218(a)(5) because: (1) 38 U.S.C. § 502 did not provide Szabo with an "adequate" and "prior" opportunity to challenge the regulation, as required by 5 U.S.C. § 703, and (2) 38 U.S.C. § 502's jurisdictional mandate violates Szabo's right to due process. We disagree.

### a. "Adequate" and "Prior" Review

The Federal Circuit provides an adequate forum for judicial review of agency action. It is axiomatic that Congress may prescribe the jurisdiction of inferior federal courts and, if it so chooses, vest jurisdiction in a single court. U.S. Const. art. iii, § 1, cl. 1; *Yakus v. United States*, 321 U.S. 414, 429 (1944). "There is no constitutional requirement that [a challenge] be made in one tribunal rather than in another, so long as there is an opportunity to be heard and for judicial review which satisfies the demands of due process." *Yakus*, 321 U.S. at 444.

Szabo seeks review of the facial constitutionality of 38 C.F.R. § 1.218(a)(5). In accordance with the APA, the Federal Circuit will "hold unlawful and set aside [VA regulations] that [are] 'contrary to constitutional right, power, privilege, or immunity.'" *Preminger*, 517 F.3d at 1305 (quoting 5 U.S.C. § 706(2)(B)). Neither Szabo nor the dissent

advance any reason why the Federal Circuit is not an adequate forum to litigate this challenge, and we are unable to discern any such inadequacy. *See Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 627 (9th Cir. 1985).

Nonetheless, the dissent reads 5 U.S.C. § 703 and 38 U.S.C. § 502 as vesting exclusive jurisdiction in the Federal Circuit only if Szabo had an opportunity to challenge 38 C.F.R. § 1.218(a)(5)'s facial validity *prior to his conviction*. To the extent that 5 U.S.C. § 703 imposes such a requirement, it is also satisfied here.

Our dissenting colleague seems to agree that 38 U.S.C. § 502 generally provides a prior opportunity for review of VA regulations, and that the statute therefore generally deprives us of jurisdiction to consider facial challenges to VA regulations. Nonetheless, according to the dissent, Szabo did not have a prior opportunity to challenge 38 C.F.R. § 1.218(a)(5) because one in Szabo's position would not have challenged the regulation prior to his indictment, and once Szabo was indicted, it would have been burdensome for him to maintain parallel litigations in two different forums. With respect, our colleague is mistaken.

The dissent seems to read 5 U.S.C. § 703 as creating an exception to 38 U.S.C. § 502's jurisdictional mandate for any criminal defendant who lacked a prior plan to violate the VA regulation under which he is charged. Our colleague's construction is entirely unworkable as a practical matter. Under this reading, a federal court's jurisdiction to consider a criminal defendant's facial challenge to a VA regulation—that is indisputably valid with regard to his conduct—turns on an individualized analysis of *when* a

criminal defendant formed the requisite intent to commit a regulatory offense.

Moreover, our colleague's construction of 5 U.S.C. § 703 finds no support in the APA, and it conflicts squarely with Congress's desire for uniform review of VA regulations. As we discuss above, Congress assigned review of VA regulations to the Federal Circuit in order to ensure national uniformity in the status and enforcement of those regulations. Because Congress prescribed a centralized forum to review the validity of VA regulations, "[i]t is hard to believe that Congress . . . would have made the remedy optional and contemplated that the regulation could also be challenged by defiance." *United States v. Zenon-Encarnacion*, 387 F.3d 60, 67 (1st Cir. 2004) (en banc) (Boudin and Lynch, JJ., concurring). Our dissenting colleague's position—that the applicability of 38 U.S.C. § 502's jurisdictional bar turns on *when* a criminal defendant formed the requisite *mens rea* to violate a VA regulation—would create an end-run around Congress's clear intent to vest the Federal Circuit with exclusive jurisdiction to consider the validity of VA regulations, and it would invite the very disruption that Congress sought to prevent. We reject this reading.

The dissent further argues that Szabo did not have an opportunity to challenge 38 C.F.R. § 1.218(a)(5) prior to his conviction because under our recent decision in *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827 (9th Cir. 2014), Szabo could not have brought a justiciable pre-enforcement challenge. Again, we respectfully disagree. In *Protectmarriage.com*, political committees that supported the passage of California's Proposition 8 sought an exemption from future campaign contribution reporting requirements on the basis that the committees *might* support future campaigns

opposing same sex marriage and that the State's disclosure requirements *might* deter potential contributions to such future efforts. *Id*. On appeal, we held that we lacked jurisdiction over the plaintiffs' pre-enforcement suit because the plaintiffs failed to articulate a concrete and immediate threat of injury. *Id*. at 838–41. Unlike the *Protectmarriage.com* plaintiffs, Szabo could have articulated a well-founded, concrete, and imminent fear that 38 C.F.R. § 1.218(a)(5) would be enforced against him. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342–46 (2014) (holding that a pre-enforcement challenge is ripe where a party can articulate a "credible threat" that a statute will be enforced against him).

Szabo was on notice that 38 C.F.R. § 1.218(a)(5) prohibits the specific type of disruptive conduct that is at issue in this case. Not only is the regulation published, *see United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971); *A&W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1111 (9th Cir. 1998), but also Szabo had been disciplined for engaging in similar conduct in the past. Szabo has a long history of causing disruptions at the VA hospital. Due to this behavior, Szabo was required to have a police escort when he visited the facility, and he was only permitted to be treated by one particular physician. In light of these previous administrative sanctions, Szabo could have articulated a credible threat that he would be prosecuted if he engaged in similarly disruptive conduct in the future. *Susan B. Anthony List*, 134 S. Ct. at 2345 (Past enforcement against specific conduct is "good evidence" that a litigant faces a legitimate threat of future enforcement, and administrative sanctions alone "may give rise to harm sufficient to justify pre-enforcement review." (citing *Ohio Civil Rights Comm'n*

*v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625–26, n.1 (1986))).

For these reasons, we find it likely that the Federal Circuit would have entertained a pre-enforcement challenge to 38 C.F.R. § 1.218(a)(5), and the mere fact that Szabo may not have had a strong incentive to bring such a challenge prior to his indictment does not affect our jurisdictional analysis. Moreover, even after Szabo was indicted, he could have challenged 38 C.F.R. § 1.218(a)(5) in a parallel proceeding, and "the inconvenience" of challenging the regulation in an alternate forum would not have outweighed the government's interest "in having a centralized, unitary scheme of review[] . . ." *Yakus*, 421 U.S. at 437 n.5. We therefore reject the dissent's interpretation of 5 U.S.C. § 703 and hold that 38 U.S.C. § 502 deprives us of jurisdiction to consider Szabo's request that we invalidate 38 C.F.R. § 1.218(a)(5).

### b.  Due Process

Finally, we hold that 38 U.S.C. § 502's jurisdictional bar does not violate Szabo's right to due process. This conclusion follows directly from *Yakus v. United States*, in which the Supreme Court explicitly held that a defendant's due process rights are not violated merely because he must challenge a regulation under which he is charged through a special statutory review procedure. 321 U.S. at 427–44.

In *Yakus*, the Supreme Court considered a provision of the Emergency Price Control Act of 1942, which required that challenges to the statute's implementing regulations be brought only in the Emergency Court of Appeals, and then only within sixty days of a regulation's promulgation. 321 U.S. at 427–28. The defendants in *Yakus* declined to

challenge the validity of a price regulation pursuant to this procedure, but later attempted to challenge the regulation when they were prosecuted for violating it. The Supreme Court held that "the provision of the Act, so construed as to deprive petitioners of opportunity to attack the [r]egulation in a prosecution for its violation," did not "deprive them of due process of law," because an administrative pathway existed that allowed for challenges to the regulation. *Id.* at 431–33. The Court expressly stated:

> [W]e are pointed to no principle of law or provision of the Constitution which precludes Congress from making criminal the violation of an administrative regulation, by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity, or which precludes the practice, in many ways desirable, of splitting the trial for violations of an administrative regulation [between]. . . the issue of its validity . . . and the issue of [its] violation . . . . Such a requirement presents no novel constitutional issue.

*Id.* at 444.

In denying the petitioners' due process challenge, the *Yakus* Court emphasized that a due process challenge is not appropriate where "[a criminal defendant] failed to seek the administrative remedy and the statutory review which were open to [him] and [does] not show[] that had [he] done so . . . [he would have been deprived of] judicial remedies adequate to protect [his] rights." *Id.* at 434. "Only if we could say in advance of resort to [a] statutory procedure that it is incapable

of affording due process . . . could we conclude that [a criminal defendant has] shown any legal excuse for [his] failure to resort to it or that [his] constitutional rights have been or will be infringed." *Id.* at 435.**[4]**

In light of *Yakus*, we can divine no reason why review of 38 C.F.R. § 1.218(a)(5) in the Federal Circuit would not provide Szabo with due process of law. "Congress, through its power to define the jurisdiction of inferior federal courts . . . [may] give [one court] exclusive equity jurisdiction to determine the validity of [administrative regulations] and foreclose any further or other consideration of the validity of a regulation as a defense to a prosecution for its violation."

---

**[4]** Our dissenting colleague highlights that the *Yakus* Court stated: "We have no occasion to decide whether one charged with criminal violation of a duly promulgated *price regulation* may defend on the ground that the regulation is unconstitutional on its face." *Id.* at 446–47 (emphasis added). To the extent that this language suggests that the Supreme Court might have entertained a facial constitutional challenge to the price regulations (which we do not believe that it does), we note that the statutory review procedure at issue in *Yakus* only permitted challenges to price regulations within sixty days of the regulation's promulgation. Under this review procedure, there was *no forum* in which a defendant could challenge the constitutional validity of a regulation under which he was convicted if he failed to bring a challenge immediately after the regulation was promulgated—a result that arguably raises a difficult constitutional question. But in assessing the statutory review procedure at issue in *Yakus*, the Court also analyzed several similar review provisions and expressed no reservation with respect to those procedures that were not temporally limited. *Id*. at 445 ("[T]he denial of [a facial] defense in such a case does not violate any provision of the Constitution."). Here, Szabo could have challenged the validity of 38 C.F.R. § 1.218(a)(5) in the Federal Circuit at any time prior to his conviction and retains the right to challenge the regulation. He is only limited with regard to the *forum* in which he must bring such a challenge, and this inconvenience does not amount to a denial of due process. *Id.* at 437, 437 n.5.

*Id*. at 443. Like the Emergency Court of Appeals, which was at issue in *Yakus*, the Federal Circuit "has power to review all questions of law . . . [including] any question of the denial of due process or any procedural error appropriately raised in the course of the proceedings." *Id.* at 437. Any decision by the Federal Circuit is reviewable by the Supreme Court. And the mere inconvenience of challenging the facial validity of 38 C.F.R. § 1.218(a)(5) in an alternate forum does not deprive Szabo of due process of law. *Id.* at 437 n.5.

In concluding that 38 U.S.C. § 502 does not violate Szabo's right to due process, we emphasize that the Supreme Court did not find a due process violation in *Yakus*, even though the Emergency Price Control Act precluded a criminal defendant from bringing any challenge to the price control regulations outside of the sixty-day review procedure that was available in the Emergency Court of Appeals. By contrast, we have entertained Szabo's challenges to the constitutionality of 38 C.F.R. § 1.218(a)(5) as it applies to his conduct, Szabo could have challenged the facial validity of 38 C.F.R. § 1.218(a)(5) at any time in the Federal Circuit, and Szabo retains the right to bring a facial challenge to 38 C.F.R. § 1.218(a)(5) in the Federal Circuit. If at some point in the future Szabo persuades the Federal Circuit that the regulation is unlawful, he is also free to later seek collateral relief from his conviction.

Despite the existence of various avenues through which Szabo could properly challenge the validity of the regulation under which he was charged, Szabo has declined to take advantage of the administrative review procedures that are available to him. Instead, Szabo asks us to create an exception to 38 U.S.C. § 502's jurisdictional bar so that we can consider whether 38 C.F.R. § 1.218(a)(5) is overbroad with regard to

hypothetical conduct that is not before us. The Due Process clause does not compel us to grant such exceptional relief, and we hold that we lack jurisdiction to consider Szabo's request to invalidate the regulation.

## CONCLUSION

For these reasons, we affirm the judgment of the district court with regard to Szabo's as-applied challenges, and we dismiss this appeal for lack of jurisdiction with regard to Szabo's facial challenge.

## AFFIRMED IN PART, DISMISSED IN PART.

D.W. Nelson, Senior Circuit Judge, concurring in part and dissenting in part:

I only disagree with the majority opinion on one point: whether we lack jurisdiction to hear Szabo's overbreadth defense. Because I believe we do have jurisdiction, I respectfully dissent.

The right to bring an overbreadth challenge is an important safeguard of civil liberty. By invalidating unfairly vague and far-reaching statutes, it serves to protect the liberty interests of those not before the court, and provides legislative bodies burdening speech with a compelling reason to draft narrowly tailored laws. *Massachusetts v. Oakes*, 491 U.S. 576, 586 (1989) (controlling portion of opinion by Scalia, J., concurring in the judgment in part and dissenting in part). Thus, a defendant retains the right to bring an overbreadth challenge to the law underlying her prosecution

even if her own conduct is not protected by the First Amendment. *Id.* at 586–88; *Bigelow v. Virginia*, 421 U.S. 809, 815–16 (1975) ("This Court often has recognized that a defendant's standing to challenge a statute on First Amendment grounds as facially overbroad does not depend upon whether his own activity is shown to be constitutionally privileged.").

Szabo cannot raise his overbreadth argument in these proceedings, according to the majority, because Szabo should have pursued this defense by filing a civil lawsuit in the Federal Circuit *before he was even indicted*. I disagree. The relevant statutory framework does not evince the clear congressional intent required to deprive us of jurisdiction to conduct constitutional judicial review. Moreover, the doctrine of ripeness would have barred any pre-enforcement civil lawsuit. And even if it would not, a civil lawsuit would have been an inadequate substitute for litigating this defense in criminal proceedings, where Szabo has the right to counsel.

But what worries me most is that the majority's holding gives Congress broad power to require a court to exercise criminal jurisdiction but prevent it from applying the Constitution. This holding contradicts Article III of the Constitution and our traditional conception of judicial power.

## I. Jurisdiction Exists Because Szabo had No Prior and Adequate Opportunity for Review

When Congress centralized judicial review of VA rules and regulations in the Federal Circuit, it incorporated a savings clause from the Administrative Procedures Act designed to ensure that judicial review would remain available to criminal defendants who did not have a "prior

[and] adequate . . . opportunity" for review.  38 U.S.C. § 502; 5 U.S.C. § 703.  This exception to exclusive Federal Circuit jurisdiction is a sensible way to streamline enforcement proceedings and ensure that criminal defendants have a full and fair opportunity to be heard.

To me, it seems clear that no such opportunity existed in this case.  Szabo was charged with disorderly conduct after engaging in a spontaneous outburst at a VA hospital.  He had no plan to engage in disorderly conduct, and no reason to anticipate a prosecution for disorderly conduct.  Prior to these proceedings, Szabo thus had no reasonable chance to assert his claim that the VA disorderly conduct regulation is unconstitutionally overbroad.  We should therefore conclude that jurisdiction to hear his overbreadth argument exists in these proceedings.

The majority concludes, however, that Szabo could have asserted his overbreadth challenge in a pre-emptive civil lawsuit in the Federal Circuit, and that we therefore lack jurisdiction over his overbreadth defense because he had a prior and adequate opportunity to assert it.  I cannot agree.

First, any pre-enforcement challenge would have been barred by the doctrine of ripeness.  When a plaintiff fearing prosecution under a law seeks pre-enforcement judicial review, ripeness generally requires the plaintiff to have a "concrete plan to violate the law in question." *Protectmarriage.com v. Bowen*, — F.3d —, 2014 WL 2085305, at *8 (9th Cir. 2014) (quoting *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1139 (9th Cir. 1999)).  Here, however, Szabo had no "concrete plan" to violate the law; his violation was a spontaneous outburst.  A court hearing his pre-emptive lawsuit would be confronted with a

case where the plaintiff asserted that the doctrine of ripeness was satisfied because maybe, someday, contrary to his plans and intentions, he would violate the VA's regulation. Such a lawsuit, where "the injury at issue is speculative, or may never occur," is precisely what the doctrine of ripeness is meant to bar. *Id*.

The majority claims that Szabo would have been able to bring a pre-enforcement challenge because the VA regulation was published, Szabo had been "disciplined" due to disruptive behavior, and was required to have a police escort. But the existence of a proscriptive law does not make a dispute ripe. *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) ("[T]he mere existence of a statute is insufficient to create a ripe controversy."). Moreover, the majority does not point to a single past instance in which Szabo was threatened with prosecution for disorderly conduct, which is what our precedent requires. *Thomas*, 220 F.3d at 1139 (noting that a "generalized threat of prosecution" is not sufficient, and that courts look for "a specific warning or threat to initiate proceedings"). If anything, past violations of the law coupled with non-enforcement weigh *against* a finding of ripeness. *See id*. at 1141. Furthermore, the need for police supervision may suggest some propensity for disruptive behavior, but the majority cites no case finding that a pre-enforcement dispute is ripe solely due to a plaintiff's propensity to violate the law. Additionally, since a police presence would make Szabo more likely to follow the law, not more likely to violate it, Szabo's police escort cuts against a finding of ripeness based on propensity alone.

Second, a pre-emptive civil lawsuit in the Federal Circuit would not have provided an "adequate" opportunity for review. 5 U.S.C. § 703. To determine the adequacy of an

opportunity for judicial review under 5 U.S.C. § 703, courts should conduct a case-by-case analysis to determine whether collateral proceedings are a suitable substitute for review in enforcement proceedings. *See* H.R. Rep. No. 79-1980, pt. 4, at 42 (1946) (a prior opportunity for review must be "*adequate to the case*") (emphasis added); S. Rep. No. 79-752, pt. 4, at 27 (1946) (same). Here, Szabo is an indigent criminal defendant, and thus he had a right to appointed counsel to assist him with his defense. *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). Because this right is "fundamental and essential to a fair trial," *id.* (quotation marks omitted), review in the Federal Circuit could be "adequate to the case" only if Szabo also had a right to appointed counsel in those proceedings. But no such right exists. While Szabo did enjoy the assistance of counsel in his criminal proceedings, the majority's holding would cause Szabo to confront the power and sophistication of the United States on his own. This amounts to a deprivation of the right to counsel, and therefore pre-enforcement Federal Circuit review would not have provided an "adequate" opportunity for review.

Third, even if it were legally possible for Szabo to obtain pre-enforcement review in the Federal Circuit, the majority cannot dispute the evident impracticality and unrealistic nature of this scenario. Szabo is an indigent criminal defendant who had neither the means nor the motive to pursue a pre-emptive lawsuit in a court on the other side of the country. By concluding that Szabo nonetheless had a prior "opportunity" to obtain judicial review, the majority has ventured to the boundaries of that word's meaning.

By adopting this interpretation of the term "opportunity," the majority's holding contravenes the principle that

constitutional judicial review is presumed to be available unless Congress' contrary intent is clear. *Califano v. Sanders*, 430 U.S. 99, 109 (1977). In 5 U.S.C. § 703, Congress has set out an ambiguous standard under which jurisdiction to conduct judicial review exists in enforcement proceedings unless the defendant had a prior and adequate opportunity for review. The hazy line drawn by this statute stands in marked contrast to instances where Congress has made its intent clear. *See*, e.g., 43 U.S.C. § 1652(d) (limiting jurisdiction over "claims alleging that an action will deny rights under the Constitution of the United States" to a sixty-day window); 42 U.S.C. § 7607(b)(2). Applying the presumption in favor of jurisdiction, I would conclude that we may hear Szabo's overbreadth defense because he had no reasonable opportunity to obtain prior and adequate judicial review. By contrast, the majority's broad interpretation of the term "opportunity" construes 38 U.S.C. § 502 and 5 U.S.C. § 703 to strip jurisdiction as broadly as possible, which is contrary to our rules of construction.

Finally, the majority suggests that Szabo had a "prior" opportunity for review because, post-indictment, he could have brought a "parallel" proceeding in the Federal Circuit. At best, parallel proceedings would provide a *contemporaneous* opportunity for review, not the *prior* opportunity required by 5 U.S.C. § 703. *See* H.R. Rep. No. 79-1980, pt. 4, at 42 (1946) (explaining that "prior" means "prior in time."); S. Rep. No. 79-752, pt. 4, at 27 (1946) (same); s*ee also U.S. E.P.A. v. General Elec. Co.*, 197 F.3d 592, 599 (2d Cir. 1999). Moreover, Szabo was convicted only four and a half months after being charged, and cases filed in the Federal Circuit take on average twice as long to be resolved on the merits. United States Court of Appeals for the Federal Circuit, Median Disposition Time for Cases

Decided by Merits Panels, *available at* http://www.cafc.uscourts.gov/images/stories/Statistics/med%20disp%20time%20merits_chart.pdf. Thus, if anything, a parallel proceeding in the Federal Circuit would likely have been a "subsequent" form of review, not a "prior" form of review.

## II. The Majority's Holding Contradicts Article III of the Constitution.

The majority's interpretation of 38 U.S.C. § 502 and 5 U.S.C. § 703 leads it to the novel holding that Congress may prevent federal courts from applying the Constitution in an entire class of criminal cases. The majority does not cite a case where a criminal defendant has been barred under comparable circumstances from challenging the constitutionality of the law he is accused of violating. Although the majority relies heavily on *Yakus*, the *Yakus* Court explicitly stated that it had "no occasion to decide whether one charged with criminal violation of a . . . regulation may defend on the ground that the regulation is unconstitutional on its face." *Yakus v. United States*, 321 U.S. 414, 446–47 (1944).

While this exceptional form of jurisdiction stripping might be appropriate in a narrow set of circumstances, the majority's holding appears to apply broadly. The breadth of this holding raises several questions. What constitutional defenses can Congress require a criminal defendant to raise in the Federal Circuit? Could Congress require criminal defendants to raise *all* constitutional challenges to statutes and regulations in this way? The majority neither acknowledges nor addresses these questions. My concern is

that the majority's broad holding appears to approve unprecedented changes in how judicial review is conducted.

It belies our legal tradition to conclude that Congress, without any limits, can convene courts that enforce criminal laws but not the Constitution. "It is emphatically the province and duty of the judicial department to say what the law is. . . . [I]f a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty." *Marbury v. Madison*, 5 U.S. 137, 177–78 (1803). Courts stripped of their authority to apply the Constitution are no longer part of an independent branch of government that exercises the "judicial Power of the United States." U.S. Const. Art. III § 1; *see also Estep v. United States*, 327 U.S. 114, 126–27 (1946) (Murphy, J., concurring) ("Congress lacks any authority . . . to command a court to exercise criminal jurisdiction without regard to due process of law or other individual rights." (emphasis added)). Thus, by concluding that Congress may require courts to enforce criminal law but broadly strip them of the authority to apply constitutional law, the majority's holding violates Article III of the Constitution.

Constitutional review is integral to our conception of justice and judicial power. An individual charged with a crime expects that he will be tried before a court with full authority to protect his rights by applying the law of the United States. The majority casts doubt upon these expectations, and I cannot agree.

**III.    Even if the We Lack Jurisdiction, We Should Stay the Proceedings to Permit Szabo to Pursue Review in the Federal Circuit.**

Finally, even if we lack jurisdiction to hear Szabo's overbreadth defense, we should not yet affirm his conviction. Instead, to insure that Szabo may obtain judicial review in a court with jurisdiction to hear this defense, we should grant his request for a stay to allow him to pursue this defense in the Federal Circuit. *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).

Szabo's request for a stay to pursue review in the Federal Circuit came late in these proceedings, but this delay is justified by the government's changing position in this case. The government never contested the existence of jurisdiction over Szabo's overbreadth argument in the district court. Instead, it raised this argument for the first time in a letter to the court filed less than a week before oral argument in this appeal.   Szabo sought Federal Circuit review almost immediately after he learned of the government's new position, and thus sought review in the Federal Circuit with diligence appropriate to the circumstances.

**IV.    Conclusion**

Szabo should be permitted to raise all of his constitutional defenses in these proceedings.  Because the majority reaches a contrary result, I respectfully dissent.